The court now calls Agenda No. 13-116054, Elizabeth Keating et al. v. City of Chicago. Are the parties ready to proceed? Yes. Mr. Reagan, you may proceed. May it please the Court? So moved. My name is Mike Reagan. I represent the plaintiffs in this case. I think I can safely speak for Ms. Layton as well as myself and my co-counsel in thanking the Court for giving us the opportunity to argue this case on this historic day. This case draws upon the power and duty of this Court to declare governmental action to have been improper when it is found to have been taken without the power to act and to declare a law void when it is found to be unconstitutional. The first issue I'd like to take up is that Chicago did not have municipal authority to enact its red-light camera ordinance in 2003. This issue was grounded on Sections 6H and 6I of Article VII of the Constitution in 1970 and on several statutes. The legislature has expressly limited by statute the authority of any municipal entity, including home rule entities such as the City, to establish and enforce traffic laws. Each of these statutes is effective here to require the conclusion that the City did not have the authority to pass its red-light camera ordinance in 2003. There are three vehicle code provisions which apply. The first two, Sections 207 and 208.1, provide that no local authority shall enact any ordinance in conflict with that chapter and that the provisions of the chapter, we're talking about the vehicle code, be uniformly applied and enforced throughout the state in all other political subdivisions and in all units of local government. The third section that we rely on, the statute of Sections 208.2, specifically addresses home rule, saying that the provisions of this chapter, again, Chapter 11, limit the authority of home rule units to adopt local police regulations inconsistent herewith. The fourth statute is in the state municipal code and that forbids administrative adjudication rather than judicial adjudication, as is required for traffic offenses by the state, of any offense under the Illinois Vehicle Code or a similar offense that is a traffic regulation governing the movement of vehicles. What's wrong with the argument, Mr. Reagan, that it's a supplement to rather than an alternative to the relevant vehicle code provisions? Because it destroys uniformity. It is simply different in many ways and it destroys uniform enforcement. So you are ticketing the owner versus the driver. You're having administrative adjudication versus judicial enforcement. You have a uniform citation versus this ticket. And they're supposed to be uniform, which is what the statute said. So it's here, this business about governing the movement of vehicles, that the statement in the appellate court order has caught the lay and legalized and the public eyes of the state. The appellate court found that the municipal code did not serve to limit the authority of the city because the cameras are only, quote, capturing a moment in time depicting the vehicle's use in dissipating a red light signal. So it's therefore something that is not regarding the movement of vehicles. But on this day and in this town, I can't help but recall that Lincoln was an appellate lawyer. And while the story may be apocryphal, and I have researched it in preparation for today, he's sometimes credited with saying that if you call either a dog's or in another version, a cow's tail or leg, that it still has only four legs. So calling a photo of a vehicle caught in the move through an intersection, a static moment in time alone, yet seeking to prosecute for having that vehicle having moved into the intersection against a red light, does not make a movement of a vehicle, not a movement of a vehicle. The Chicago version of the red light prohibition says that these, quote, signals apply to drivers. It doesn't say that they apply to owners. And the fundamental violation is failing to stop before entering the intersection, both under the vehicle code and under the city ordinance. This is not a different offense, not one against the owners, as the city will argue to good length. There's abundant authority in support of our position, but local governments do not have authority to establish alternative violation and enforcement schemes like the city's. People like Sir L. Ryan versus the village of Antelope Park, multiple municipalities, the first district 1999, multiple municipalities had set up alternative traffic schemes, and the Attorney General sued on the relation with the Secretary of State, saying this can't happen. And the court held that the program was both home rule and not, to be without authority, because they disrupted the uniform enforcement of the code's provisions. And it's the lack of uniformity that makes the ordinances inconsistent with the policy of uniformity, clearly expressed in Chapter 11 of the vehicle code. Cadham Trucking versus City of Chicago, First District 2011, the city's attempt to regulate overweight vehicles in a non-uniform way was disallowed. And there the court rejected an argument, much like is being made to you here today, that the ordinance prohibiting the operation of overweight vehicles did not involve the movement of vehicles. And the court soundly disagreed. We've also cited in our brief at page 21 an Attorney General's opinion, which is detailed and clear, saying that, quote, the vehicle code requires uniformity in the enforcement of traffic regulations, as well as the substantive regulations themselves. So violations of the ordinance are triggered by a vehicle entering an intersection against a red light, and that is exactly what is also prohibited by the vehicle code. Mr. Reagan, I take it since it's not raised in your brief, you have no problem with the concept that the owner of the vehicle is being ticketed and has to pay the fine as opposed to the alleged violator. That's exactly right, Justice Carminer. We're not raising that as an issue. I mean, we think that it is a high indicia of lack of uniformity, but we are not focusing on that as an issue all by itself. And we haven't addressed, or have no need to address whether the state could do that if they wanted to. But the state hasn't, and therefore there's this huge difference. So in conclusion on this issue, the city lacked the power to pass this ordinance, which set up parallel offenses involving the movement of vehicles with different penalties and only administrative adjudication. So turning to the next issue, the 2006 Enabling Act is unconstitutional local legislation. It did not retroactively bestow municipal authority after it was enacted, and it did not retroactively animate the red light ordinance, which was void ab initio because of the lack of authority in 2003, which we've just discussed. The constitutional defect in the Enabling Act is grounded on Section 13 of Article 4 of the Illinois Constitution, and that section, well known to this Court because it's a frequent topic in the opinions, has two powerful sentences. The first is that the General Assembly shall pass no special or local law when a general law is or can be made applicable. The second sentence is that whether a general law can be made applicable shall be a matter for judicial determination. This Court's well aware of the power and the discretion, the responsibility vested in this Court by that second sentence, changing the law from the 1870 Constitution. This Enabling Act is a local law. It applies only to the government of a portion of the state, which is the definition of a local law, and it is favored in counties. It's not only nakedly local, but in analytical terms it then creates another problem, which is it creates a closed-end class. Naming these eight counties, which is such an anomaly in the Illinois statutes. Are we to do anything, Mr. Reagan, with the legislative history that at least seems to support the city's argument that it's not local, that namely because of their cost and expense red-light cameras make sense only in high-traffic jurisdictions such as the eight counties listed? The legislative history, I think, cuts in our favor because the legislative history, and I will, well, I'll take up that first, and that is that the, could you phrase it one more time, please? I was just saying that it would seem that the legislative history, I know that's not your position, supports the city's argument that it's not local, that it makes sense from the perspective that because of the cost and the purpose that red-light cameras make sense only in high-traffic jurisdictions, and the eight counties listed in the Act are the eight highest-traffic counties in the state. Well, the legislative history talks about populous counties, but they never say it's the most populous because it's not. They left out the bagels, so they've not included the eight most populous. And the Act operates only on municipalities, but it's classified by counties, and so there is no particular connection to that, and the legislative history then cuts our way because it was first introduced twice as a general law. It didn't pass the first time. It was reintroduced again as a general law, and when it looked like it wouldn't pass, then they added the legislative clip on it to limit it to those eight counties. How does it close the class to those eight counties? Because no other county can become one of the named eight counties, and so that... But there would be nothing to prevent them from adding counties at a later time. I mean, is there anything in the statute that says... I mean, in the Peoria school case, it was drawn in such a way that there was only one district that could possibly ever meet the qualifications, but I'm having a little trouble seeing that applicable here. I think where that becomes relevant, then, is the lack of rationality because there is no reason, there is no cognizable reason why it should be limited to only eight counties now. Well, what about the fact that those eight counties are certainly, at least maybe contiguous to the largest metropolitan areas of our state, Chicago and St. Louis? No county has enacted a red light camera ordinance. It is only municipalities which do it, and then when the analysis of this is taken at the municipal level, which is what the circuit court and the appellate court never did, there's no commonality, there's no rationality between the small towns in these counties and large ones, and then comparing them to other places in the state, Bloomington Normal, Champaign, Rockford, all of those places which would have much more congestion, much more red light problems than these counties do. And then, Justice Thomas, back to your question for just a quick second. There is no burden which is imposed on anyone by the statute. It is merely an enabling act, and so if any given municipality says, I don't, we don't need or wish to do this because of the expense, then they simply don't. I mean, there's not a single dollar of unfunded expense which is imposed. Mr. Reagan, could you address Coutinello, a case where in 1984 this court dealt with somewhat similar issues where the legislation specifically provided that DuPage, Cain, and McHenry counties could tax. A very similar challenge was made to that statute, and this court held that the argument that those three counties were experiencing a great deal of population boom and so there was a rational basis for this new taxing authority to satisfy the Constitution. How is that different from what we have here? There is a massive difference, Justice Weiss, between Coutinello and this case. So in Coutinello, the three counties that were named were permitted to impose the fuel tax over a vigorous dissent from Justice Freeman. But the operation of that statute was purely at the county level, and yet here the operation that is relevant to the decision before the court is at the municipal level. Help me understand what makes such a distinction in terms of the constitutional provision. Why is this difference between county and municipality so determinative? Because for this statute to pass muster with this court, it has to be found rational. It has to be found non-local, and it has to be found rational. And so we cited two cases, Belmont and one other, which I'll mention in a second, in which there were classifications made at the county level, but where the statute operated at a sub-level, that is, they were fire protection districts within the counties. And this court said that that's not rational at all, that if you want to address the needs of municipalities, if you want to say that this is rational and why it shouldn't pass muster, then you have to look at the population of the counties as opposed to merely looking at the population of the municipalities as opposed to looking at the population of the counties. And so in those two cases, this court refused to approve a statute which classified by county and yet which operated at either the municipal level or the municipal level is what it was. But the city's argument, I think, is that classification is rational because it's counties that are contiguous to large metropolitan areas, and then it applies to all cities and villages, and that's high-traffic areas through those areas. That is a precise capitalization of their argument, and yet we expect and suggest that it's not rational at all because we've given examples in the brief of municipalities which are closer to Chicago but are not in a favored county versus a municipality which is farther away and smaller but it is in a favored county, and so it gets to do it. And there is no reason, there's no rational reason that it will even go to their rational basis two-pronged test why that split, why the analysis, why the classification should not have been made at the municipal level here, especially considering the fact that there is no burden which is placed upon any municipality by this act. The two cases in which this court has twice-stricken laws which classified by reference to population-defined counties but operated only on political units within those counties are Ingray-Belmont Fire Protection District, 1986, which is, I think, responsive to your question, Justice Tice, and also Ingray-Petition-the-Village-of-Vernon-Hills, this court, 1995, and the court held, the court said, there is no relationship whatsoever between county population and the need for municipalities to consolidate fire protection districts. We are unable to conceive of any possible connection that exists between the act's county-wide population classification and the desirability of eliminating smaller fire protection districts within a given municipality. We've talked about Kootenai, we've talked about the fact that the statute operates on municipalities within the counties, and I suggest that that is all the difference in the world when you read this case in conjunction with Belmont and the other case which we just mentioned. And Justice Freeman, I realize, in dissent, noted that the act there impermissibly merely named counties without any qualifying characteristics. Time is short. The next issue is that even if the court were to find enabling acts to be constitutional, it did not retroactively give life to the city's void 2003 ordinance. So the Enabling Act operated in the future only, and what it said is that any municipality or county may act, and yet the city never did. And so we have the Enabling Act, the city wants to tell you that therefore it's a fact, though, that the city's 2003 ordinance was made active again, but there's simply no reason behind that whatsoever. I'd like to take a forfeiture just briefly here, and frankly I have serious doubts as to whether forfeiture applied to the plaintiffs here at all, because once the ordinance is found by this court to be void, then the city is the one that should have to offer an explanation as to how that void ordinance is to be regarded as enforceable. It's the city that has to convince this court, it's not us that had to come forward in the first instance with the theory that, well, if they reenacted it, it would have worked. And I don't think, I respectfully suggest to the court, that forfeiture is designed to operate at this granular level. And secondly, the invalidity of that ordinance is a central issue on appeal, and once that's addressed, the question of whether the ordinance has been rendered enforceable by the Enabling Act is, quote, inextricably intertwined within the other issues, within the meaning of this court's opinion in People v. Alcoser in 2011. Lastly, this issue is certain to rise again. There are a legion of people out there who can raise it. It's pending in circuit court, as we've noted in our brief, in Cata v. The City. It should not be left on the table. It is fully briefed, and there is not a scintillant of surprise. We suggest that the appellate court correctly decided the voluntary payment issue, and we stand in our briefs on that, and I have peaked a red light. There is no dispute, though. Is there, counsel, that all of the plaintiffs in this case were issued tickets after the adoption of the 2006 Enabling Act, right? Yes, that is true. Mr. Reagan, what about on the chronology of facts? I thought I read that the ordinance was subsequently amended and reenacted. It was not reenacted. It was absolutely not reenacted. And it was amended on three occasions. The last time in 2007, the amendments, certainly the first two amendments, were absolutely cosmetic, and the third was only barely more than that, but no reenactment whatsoever. Okay, thank you. Thank you. Thank you, counsel. Ms. Leighton. Good morning, Your Honors. Good morning. May it please the Court. Your Honors, the plaintiffs were ticketed. Would you identify yourself, please, for the record? I apologize, Your Honor. Carrie Maloney Leighton, I represent the city of Chicago. Thank you. The plaintiffs were ticketed for violating the city's red light camera ordinance in 2006 or later. This was after the General Assembly expressly authorized red light cameras through the Enabling Act. Passing the Enabling Act also makes plain that the General Assembly had absolutely no intent to prohibit red light cameras or for any of the statutes that plaintiffs rely on to be preemptive of the city's red light camera program. Because all of the plaintiffs' tickets follow this clear expression of legislative intent, the city has both statutory and home rule authority for its red light camera program. This morning, I intend to explain both that the Enabling Act survives challenge under the Illinois Constitution's special or local provision, and that the General Assembly has not preempted any aspect of the city's red light camera program, which, again, it made crystal clear when it passed the Enabling Act in 2006. Turning first to the Enabling Act and whether that violates the special or local provision, I have two points to make about the Enabling Act. One is that rational basis scrutiny should apply, which this court has recognized as the appropriate test for the past decades and beyond. And two, that the Enabling Act survives rational basis scrutiny. This morning, counsel did not seem to address the argument they raised in their brief about whether there should be a rational basis test or not. We submit there should be one. They seem to suggest that the court should simply apply the language of the Constitution. And to explain in our brief, what the 1970 Constitution did was make justiciable this provision, the special or local provision, and put it on par with every other limitation on legislative authority that's in the Illinois Constitution, equal protection, due process, et cetera. So the 1970 Constitution said this court can enforce limitations on the legislative authority. However, that doesn't answer how the court should go about its judicial determination. And we submit that as with any limitation, this court first decides what level of scrutiny to apply and then goes about analyzing the enactment under that level of scrutiny. And this court has held since 1970 that rational basis is the correct test. And we submit that this court would need to overrule its entire body of precedent to arrive at a different test. Regarding the application of the rational basis test to the Enabling Act, the rational basis test asks the court to ask whether the General Assembly rationally could have concluded that the particular subjects that the law is singling out are facing a difference in their situation or condition compared to the rest of the state. And two, whether there is a conceivable rational basis for making that classification in light of the purpose of the law. As this court is well aware, rational basis is highly deferential. And the point is to decide whether the law is rational, not whether the policy is wise. Here, there was a rational basis for the General Assembly to select the locations that it did because they are different from the rest of the state that matters for the purpose of this law, which was to reduce traffic deaths and injuries that are caused by red light violations. These are the areas, the only areas in the state that are outside the two major urban centers that are located in this region. They are filled with a lot of people. They have highly traveled roads. And the municipalities in these locations are very closely spaced, one right up next to the other. The General Assembly rationally could have believed that because of the conditions that exist in these locations but not in other parts of the state, that this is where the problem of red light violations is at, is dealing with. In other words, because the conditions in these areas are such that there are a disproportionate number of red light violations, that the local resources that exist, the law enforcement resources for addressing those red lights, is not up to par because there are too many for law enforcement to address in the other manner in which the vehicle code allows for enforcing red light violations. Ms. Leibniz, is it of any consequence that Winnebago was left out? We submit it is not because Winnebago is differently situated with respect to its location. We submit that the reason for selecting these locations has to do with their population and their location combined. The General Assembly did not leave out any of the counties that surround Chicago or St. Louis. It selected all the collar counties. Winnebago is farther removed, and we submit if this court looks at the map, there is a difference in the way this county looks compared to the others. It just doesn't have the number of roads, it doesn't have, it has a population that exceeds St. Clair and Madison, but it is not close to St. Louis and Chicago, and for that reason it's differently situated. So the General Assembly rationally could have thought. And in particular, the point I'm making is that if there are too many red light violations for these locations, because of where they're located, for law enforcement to address them, then this provides a supplemental way for the locations to address the problem, so they can meet the extent of the problem. Winnebago may have a perfect balance between the number of red light violations it experiences and the police resources that currently exist to enforce the red light requirements. Counsel, your argument is based on population as well as location, as you said. But the argument that your opponent has made is that it's not the county by county that is authorizing these red light practices. It's municipalities, and within those counties, some of these municipalities have very, very small populations. Can you address that? Yes, Your Honor. We submit that the decision, the legislature singled out counties and municipalities. Both are authorized, and we submit that even the municipalities that are not as large as some elsewhere in the state are differently situated because of their location in this particular area that has all these roads where the municipalities are right next to each other. So even if the municipality may have not as many people, it's still going to suffer from the problems of red light violations because of the other conditions that exist because of where it's located. So that is with respect to all the municipalities and the counties that are in that region, and that's what differentiates those from larger cities elsewhere in the state. And we would also point out to this court that the General Assembly was no doubt aware that larger municipalities elsewhere in the state already have home rule authority to enact red light camera problems if they choose to do so. Plainly, the General Assembly was not intending to preempt any home rule authority from enacting red light camera program. It was trying to authorize red light cameras. So the General Assembly could know that Rockford and Peoria and Bloomington already have the ability, if they disagree with the General Assembly's assessment, that the balance between their law enforcement resources and the number of red light violations is sufficient. If Bloomington disagrees, then it can too pass a red light camera. So really what we're talking about is whether or not the General Assembly should have authorized non-home rule municipalities in the state. And it's quite rational for the General Assembly to believe that non-home rule units, which are not even large enough to be home rule units, that are also far from Chicago and St. Louis, experience a difference in condition. So the General Assembly has legislated precisely to the extent of the problem that it sees. And again, if home rule authorities elsewhere disagree, they can enact their own red light camera ordinance. How does the fact that the ordinance is directed at the owners of the vehicle versus the drivers as the vehicle codes, how does that impact your argument? Well, we believe, Your Honor, that the fact that it's addressed to the owners makes it a complementary piece. It doesn't substitute for enforcement of the vehicle code through police officers who observe the violation firsthand. What it does is it applies to a set of violations that would not otherwise be detected, because there is no police officer there to witness them. And moreover, if there is a police officer there to witness them, then the red light camera ordinance can't apply. So it plainly applies to an additional set of red light violations, and for that reason, it fits comfortably within the vehicle code as it exists. So we don't think that it, we certainly don't think that the vehicle code preempts the ordinance, because it is different. It addresses a different set, and it issues a different kind of liability directed to the owner instead of the driver. But it's an additional tool for local municipalities to use to combat the problem of red light violations. Let me understand. When you said it doesn't apply if an officer is there, does that mean the officer has to write a ticket and the camera is ineffective, or can the officer ignore it and let the camera do its job? Well, the ordinance doesn't specify that the police officer has to or not. It simply provides a defense for an owner who's ticketed if that driver of the vehicle got a ticket from a police officer that will proceed exactly as the rest of the tickets in the state proceed through circuit court proceedings. And so it's a defense to the application of the ordinance against the owner. In other words, it's not – But that's only if a ticket is issued. That's correct. It's only, it doesn't speak to if a police officer is there, whether that officer has to ticket the person. Thank you. So I'm turning now, unless there are further questions regarding the constitutionality of the Enabling Act, I would like to turn to the question of the city's home rule authority. And I want to point out just a couple preliminary things. First, that preemption is really the only home rule issue here. The plaintiffs have never contested that the city has the power to create a red light program because this pertains to its government and affairs. What the plaintiffs are claiming is that the city was preempted by the General Assembly. And again, preemption requires very specific intent on the part of the General Assembly as this court has long held. It requires specific language. And if the General Assembly does not express its language precisely and specifically, then the default is that under the Illinois Constitution, the city has the authority to regulate concurrently with the state. So the plaintiffs have the task of pointing to specific statutes that contain the language necessary for preemption. And we submit that they haven't done so. In addition, that there are two separate, really two separate preemption questions in this case. There is the question of whether the city's authority to create a red light program is preempted to ticket plaintiffs in the first place. And second, whether the city's authority to administratively adjudicate tickets is preempted. And both of those are necessary to completely eliminate the city's red light camera program. If this court were just to hold that administrative adjudication is preempted, that would just mean the city would have to process its tickets through circuit court. It would not mean that the city could not ticket for red light camera offenses. So in this case, again, turning back to the legislative intent, that's what preemption is about. Again, preemption is an on-off switch. Either the General Assembly intends to preempt or it doesn't. And in this case, what we know is that as of 2006, the General Assembly made explicit that it had no intent to preempt red light camera programs in the city and the other eight counties. In fact, the General Assembly wanted to authorize the city to have red light cameras. That's the opposite of the express intent necessary to preempt. In fact, the Enabling Act even explicitly references one of the statutes that plants are relying on as preemptive, which is the preemption for administrative adjudication in some cases, and says the language from that statute does not apply to red light camera regulations. So I think the General Assembly could not be more clear that it did not have the intent to preempt what the city was doing to its red light camera program. All plaintiff's tickets follow this express announcement, and we submit that it is not relevant whether these statutes might have been interpreted differently if we were standing here in 2003 before the General Assembly had announced its explicit intent not to preempt in 2006. Moreover, even if you look at the language of these statutes themselves, they're simply not preemptive. Most of them don't have the specific language necessary for preemption, that this is a limitation on homo authority. And moreover, these statutes all contain exceptions within them for ordinances, local ordinances, that do not conflict with the vehicle code. And we submit there is no conflict here between the red light ordinance and the vehicle code, because again, the red light camera ordinance does not apply when the driver is ticketed. And under the vehicle code, it's the driver's offense. Under the red light camera program, it's the owner's offense. And if the owner knows the driver got a ticket, that's a defense under the red light camera. Both of them can't apply to the same situation. It's simply a supplemental way to get at this problem of red light violations. Moreover, regarding the Illinois Municipal Code provision that preempts administrative adjudications in some cases, which I've already referenced, again, the General Assembly explicitly said that that language doesn't apply. So we submit it would be remarkable for the court to hold that in 2006, after the General Assembly said, we don't think these are traffic regulations governing the movement of vehicles. Therefore, the city is not authorized to have administrative adjudication. It would be contrary to what the General Assembly had just announced through the Enabling Act. With respect to the remaining issues, reenactment, we have three points about the plaintiff's reenactment argument. The first is they waived this in the circuit court. They didn't raise it. Second is that they forfeited before this court by not including it in their petition for leave to appeal and their questions that they present for this court to decide. And the third point is that they're just wrong. This court has held in Lilly Lake Road Defenders that preemption is different from voiding an ordinance. Preemption, according to this court, simply suspends the enforcement or the operation of a local law. It does not void a local law. And in Lilly Lake Road Defenders, the facts are exactly on point. The state passed a preemptive statute in 1970. Then in 1979, the local municipality enacted an ordinance. The question was whether that ordinance had to be reenacted in 1981 after the state lifted the 1970 preemption. This court held the local municipality didn't have to do anything. Its ordinance was not void. It was simply suspended. And when the preemption was lifted, it sprang into life. The same results should apply here in the event this court were to believe that the city's ordinance was preempted back in 2003. When the General Assembly passed the Enabling Act in 2006, it lifted the preemption. And therefore, the suspension of the ordinance was lifted too. And the ordinance could be enforced prospectively against these plaintiffs who, again, were all ticketed after the Enabling Act. Finally, with respect to the Voluntary Payment Doctrine, we would rest on our briefs unless this court has any specific questions on that. And if this court has no further questions, we respectfully ask this court to affirm the lower court's judgment. Thank you, counsel. Mr. Regan? It's not often said that a position is just plain wrong, so I'd like to take that one up last. And I will assure you that we are correct and that they are just plain wrong on that, with all due respect to counsel. So now it's been said twice. Now it's been said twice, Mr. Regan. Yes. Well, I mean it. So there is a huge difference, which we point out in the reply brief, between their cases. The first one they talk about is Lily Lake Road Defenders. And the other one is City of Burbank versus a name I can't pronounce. And those are cases where there was a statute that was passed. There was nothing wrong with the statute. Then it was preempted. We're not talking about home rule preemption. We're talking about preemption for some reason. And then later the preemption was lifted. And those two cases hold. Their two cases hold that, okay, that statute, which had been preempted for a while but which was good in the beginning, is once again enforceable. We have cited 209 Lakeshore Drive, People X Rail Larson versus Thompson, and Village and River Forest versus Midwest Bank. And all of those cases uniformly hold that if a statute is void in the beginning because of a defect, more than a procedural defect because of a lack of power, that it remains void. And one of the cases even says that an enabling act, Village and River Forest versus Midwest Bank, says the municipal ordinance invalid because the municipality lacked power to adopt it is not validated only by the subsequent enactment of an enabling statute. So it will be interesting to see how the scorecard comes out and who's right and who's wrong on that point. Back over a few things. It's likely to be said that we didn't say anything about rational basis tests. Well, we did. Our first position is that there's a simple test to be applied here is that this is a local law. And secondly, it could easily have been made general. There's no reason why it can't be applied to every red light in the state. And therefore, because of cases we cite in the first section of brief in our argument, that because it's local and because it could have been made general, therefore it's barred by the Constitution. But we're not at all afraid of applying a rational basis test. And the argument has been made to you that this is almost some sort of safe harbor that they can say rational basis. They win and they don't because this court has developed what it's called the two-prong test. And there, both prongs of the test are focused on the evil of the remedy. And the evil of the remedy here is red light violations and the injuries, et cetera, that come from that. And those are problems which are shared here in Ottawa or they're shared in Champaign, Wilmington-Normal, Oswego, wherever it's going to be. And when you apply the two-prong test, which I believe this court will, and determine is it rational, it cannot be rational that the benefits of this ordinance or this statute, the Enabling Act, were given only to a favored eight counties. If traffic deaths are a problem, they can be solved everywhere. There's nothing in the legislative history, and in fact there's nothing in their briefs, about a mismatch between law enforcement capabilities and therefore the need to have red light ordinances. I think there are many municipalities that say we have a mismatch between our needs and our resources. There was an extraordinary statement made here that the defense to our argument that there are big problems in Champaign, Winnebago, wherever it's going to be, that the General Assembly knew that those other municipalities had home rule authority. That was the statement that was made here today. And the General Assembly knew that under that home rule authority, that those municipalities could all pass red light, cameras, ordinances, if they wished to under their home rule authority. Now we of course say that they don't have that home rule authority. But if that's true, if the point to be made to you is the General Assembly knew that every other municipality, every other home rule municipality, had that power, then why pass the Enabling Act in the first place? Because if it's inherent in home rule, then what purpose, please, did the Enabling Act serve? Thank you very much. Any other questions? I think not. Thank you. Case number 116054 is with Peting v. the City of Chicago. It's taken under advisement as agenda number 13. Mr. Reagan and Ms. Layton, we thank you very much for your arguments. Ladies and gentlemen, we thank you for your interest and for being present today. Mr. Marshall, the Supreme Court's manager.